CHARLES H. FAIRLEY, Respondent, v PEEKSKILL STAR COR-
PORATION et al., Appellants.

Second Department, November 16, 1981

**APPEARANCES OF COUNSEL**

*Olwine, Connelly, Chase, O'Donnell & Weyher (James E.
Tolan, Erica B. Baird* and *Terrence J. O'Rourke* of counsel),
for appellants.

*Babchak, Daly & Lavery (Hugh A. Lavery, Jr.,* of coun-
sel), for respondent.

**OPINION OF THE COURT**

WEINSTEIN, J.

To defeat a motion for summary judgment by a media
defendant in a libel action, the plaintiff must demonstrate
that genuine and material questions of fact exist concern-
ing the challenged elements of the cause of action. The
plaintiff must also show that he can establish those ele-
ments at trial by the appropriate burden of proof (cf. *Di
Lorenzo v New York News*, 81 AD2d 844). In this action,
the plaintiff has asserted that an entire article published
by the *Peekskill Evening Star* on January 28, 1975 is
libelous.

The article was entitled "Only slim chance seen for Loyola retardate facility". It referred to a proposal made by the plaintiff for a noncommunity based, intermediate care facility of 200 beds on the grounds of a former Jesuit seminary, primarily for mentally retarded children. The purpose of the proposed institution was to provide full service care for those children who were educable. At the time of publication, program planning was not complete and the plaintiff had not made a formal application for licensure. The article took the position that the planned facility would not meet State standards concerning the care of the mentally retarded and that a formal application had little chance for success. The plaintiff claims that the *Star's* article defamed him and prevented the completion of the proposed facility. He therefore instituted this suit seeking $500,000 in damages.

After discovery had been completed, the newspaper and the corporation that owns and publishes it moved for summary judgment, contending that the comments contained in the article were not capable of defamatory meanings, that the comments were true, and that they were published with the constitutionally mandated standard of care.

Special Term denied the motion, finding that questions of fact existed. We disagree. We find that the plaintiff's action cannot survive the defendants' attack. Our decision is based in part on the plaintiff's failure to show defamatory meaning of the challenged words, in part on his failure to show falsity, and in part on his failure to show that the defendants fell short of constitutionally mandated standards of care in publishing for media defendants in libel suits.

The majority of the statements in the context of the article are not reasonably susceptible of defamatory inferences (cf. *James v Gannett Co.,* 40 NY2d 415). For example, the reporter stated that the plaintiff "describes himself as a social scientist". The plaintiff has asserted that this statement is false. But falsity is not sufficient. The statement must also be defamatory (see *Nichols v Item Publishers,* 309 NY 596, 601).

Among certain segments of the population a social scientist designation might be considered unflattering. However, the peculiarities of taste found in eccentric groups cannot form a basis for a finding of libelous inferences. In New York, defamatory meaning will be found only in "words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society. *(Sydney* v. *Macfadden Newspaper Pub. Corp.,* 242 N.Y. 208)" *(Kimmerle v New York Evening Journal,* 262 NY 99, 102; *Schermerhorn v Rosenberg,* 73 AD2d 276, 284). The negative inference must also be recognized by a substantial portion of the community (see *Mencher v Chesley,* 297 NY 94, 100). The term "social scientist" does not meet these criteria. In any event, one who states, as did the plaintiff, that he is a "social theoretician planner and developer" is not disparaged professionally by being labeled a "social scientist" (see *Nichols v Item Publishers, supra,* p 601). Courts "'will not strain'" to find a defamatory inference "where none exists" *(Cohn v National Broadcasting Co.,* 50 NY2d 885, 887).

The plaintiff also objects to the use of the word "claims" in the following portion of the article: "Fairley *claims* course credits equivalent to a M.A. in Social Psychology from the New School of Social Research and additional credits toward an MBA in Business Administration" (emphasis supplied). However, the word "claims" in the context of this sentence has no defamatory meaning. It indicates that the plaintiff is in possession of or has acquired a certain number of credits. At worst, it could mean that the statement was not checked for truth. That some people would receive a negative impression from its use cannot serve to make the statement actionable. It is the function of a reporter to indicate the extent of the investigation so that the public will have some basis upon which to evaluate his conclusions.

The above instances of lack of defamatory meaning, however, are not the only deficiencies in the plaintiff's

case. The plaintiff never demonstrated that questions of fact exist concerning the falsity of many of the statements.

We note that at common law the defamed plaintiff had no such burden. The defendant was required to prove truth as a defense (see 1 Seelman, Law of Libel and Slander in New York [rev ed], par 392). More recently, however, in cases against a media defendant, the defamed plaintiff has been required to prove falsity but only after he has been found to be a public official or a public figure. In *Rinaldi v Holt, Rinehart & Winston* (42 NY2d 369, 380), the Court of Appeals stated that "[t]his requirement follows naturally from the actual malice standard. Before knowing falsity or reckless disregard for truth can be established, the plaintiff must establish that the statement was, in fact, false." We see no significant distinction where the plaintiff is held to be a private figure and the topic of the article is a matter of public concern. In such cases the plaintiff is required to prove gross irresponsibility (see *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199) resulting in a defamatory falsity. Under such circumstances, proof of falsity is again naturally related to the standard of care. Thus, in a case with constitutional implications such as the one at bar, the defamed plaintiff must prove falsity, irrespective of his status (see *Wilson v Scripps-Howard Broadcasting Co.,* 642 F2d 371).

In this case, the plaintiff himself has admitted that most of the statements contained in the article are at least substantially true. Substantial truth is all that is necessary to defeat a charge of libel (see *Rinaldi v Holt, Rinehart & Winston, supra,* p 383). One significant illustration occurs in the article's observation that while the plaintiff has said that his next door neighbor would replace him as president of the foundation sponsoring the proposal, the next door neighbor said he "wants no part of being president". Plaintiff has admitted making the comment to the reporter and discovering only later that his neighbor changed his mind. Thus, the statement is true and cannot serve as a basis for litigation.

The actionability of some of the other comments published in the article is best measured against the standard of care required to be used in publishing them. The defen-

dants have asserted that the constitutionally mandated standard of care in this case is actual malice, based on their contention that the plaintiff is a limited issue public figure who has thrust himself into a public controversy in order to influence its outcome *(Gertz v Robert Welch, Inc.,* 418 US 323). The plaintiff points to the statement of the reporter that the article "dealt with a potentially controversial matter, yes. It was not a controversy at that time", and maintains that the gross irresponsibility standard is more appropriate to his status as a private figure involved in a matter of public concern *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, *supra).*

The status of the plaintiff must be established before the appropriate standard of care can be determined *(Greenberg v CBS, Inc.,* 69 AD2d 693, 703). The burden of proof with respect to the status of the plaintiff is on the media defendant (see *Waldbaum v Fairchild Pubs.,* 627 F2d 1287, cert den 449 US 898). The plaintiff will be considered a limited issue public figure in this case, if the defendants demonstrate that the plaintiff has voluntarily acted to influence the resolution of a public controversy. Thus, a finding that such a controversy exists in the first instance is a prerequisite to the status determination *(Greenberg v CBS, Inc., supra,* p 704).

The nature of a public controversy has been defined, and the inquiries necessary to demonstrate its existence have been ascertained, by the United States Circuit Court of Appeals for the District of Columbia in *Waldbaum v Fairchild Pubs. (supra,* pp 1296-1297): "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone,* 424 U.S. 448, 454-55 * * * Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants * * * To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons

actually were discussing some specific question. A general concern or interest will not suffice."

The media defendants herein have argued that there were three existing controversies in which the plaintiff participated. With respect to the first contention, that a controversy surrounded the sale of the former Jesuit seminary grounds, the *Waldbaum* observations are unnecessary. The record contains no evidence of a public dispute concerning this subject matter. At best, the sale and future use of this property were a matter of concern to the township and the adjoining property owners.

The defendants have also suggested that an umbrella controversy surrounding the institution of Willowbrook was in existence at the same time that public attention was focusing on the plaintiff's proposal, and that the plaintiff's actions were designed to influence the resolution of that dispute. For support, the defendants have relied on the plaintiff's statements that Willowbrook was still in the news at the time that he developed his proposal and that Willowbrook's problems illustrated the need for the type of institution proposed by the plaintiff.

We do not agree that the plaintiff's general comments concerning Willowbrook are sufficient to base a finding of an existing public controversy. Controversies may be of short duration, although the subject matter continues to be newsworthy. Without proof of the continuing nature of the controversy (cf. *Greenberg v CBS, Inc.*, 69 AD2d 693, 704, *supra*), there need be no evaluation of whether the plaintiff's actions constitute a major impact on the resolution of the dispute, or whether they constitute merely tangential and trivial participation in the controversy (see *Waldbaum v Fairchild Pubs., supra,* p 1297).

The last assertion of controversy concerns the plaintiff's proposal itself. To evaluate this argument, we must review the facts in more detail.

The plaintiff had not yet developed a program format or applied for licensure in September, 1974 when he talked to the Yorktown Supervisor about the feasibility of using the Jesuit grounds for his facility. Thereafter, on October 17, 1974, the first article concerning the plaintiff's facility was

published in the *Patent Trader*. The article described the plaintiff's proposal and stated that the proposal was in the embryonic stage. It reported generally on the sale negotiations concerning the property and other use proposals that were being considered. The article also stated that the plaintiff had talked to the Yorktown Supervisor about the feasibility of the plan and that the supervisor intended to discuss the matter with other members of the town board, even though no formal application had been made. No indication is provided in the record as to how the *Patent Trader* learned of the plaintiff's plans. The plaintiff's attention was drawn to the article by a neighbor. At the request of this neighbor, the plaintiff spoke thereafter to a group of 12 to 15 people to provide more information. The date of this meeting is not set forth in the record.

Sometime after this first article was published, the plaintiff gave a written copy of his proposal to the Yorktown Supervisor, although he still had made no formal application. The Yorktown Supervisor gave the proposal to the reporter who wrote two articles for the defendant *Peekskill Evening Star.*

The first of the *Star* articles was entitled "Retardate facility eyes Loyola Seminary site" and was published on January 16, 1975, approximately three months after the *Patent Trader* account. It reported much of the same information that the *Patent Trader* did but provided more detail. In addition, the Yorktown Supervisor was reported to have said the town board had not yet had the opportunity to discuss the plaintiff's plans. The article related that opposition was mounting against the proposal but did not identify it, indicate its extent, or articulate the source for this information. It quoted a member of the board of trustees of a local homeowners group who said he was speaking for himself when he said that the project was ill conceived and would have an adverse impact on the community. The article also quoted an unidentified woman who said that opposition was mounting because "no one is able to say for sure what is going on." The plaintiff, in response to the woman's comments gave a copy of the proposal to the quoted member of the homeowners associa-

tion to forestall rumors but again no date has been provided.

Thereafter, on January 28, 1975, the defendants published the second article, which is the subject of this case. The article contained the opinion that the proposal, which had not yet been made into a formal application, had a slim chance of approval because the concept was not viable within the programs developed by the State. It also related that many of the State officials responsible for programs for the mentally retarded had never heard of the plaintiff or his proposal. The article also concluded that the plaintiff did not have as much experience as he had claimed.

There may have been one other article published, in the *White Plains Reporter Dispatch.* The plaintiff was interviewed for an article in this paper but he had no knowledge as to whether it had actually been published. The defendants have not confirmed in any way, however, the existence of such an article and therefore it is too speculative to be considered.

Apparently, the plaintiff responded to the press attention by planning and implementing a public relations program to counteract anticipated opposition.* The plaintiff spoke to a few local homeowners groups, distributed his written proposal, and showed a film on the mentally retarded.

Upon these facts, we cannot isolate a particular public controversy. The plaintiff had not yet filed a formal application. There was no specific question before the public. Indeed the public lacked sufficient information to make any judgment on the proposal. The "opposition" was never identified. The town board had not discussed the proposal. There was no public debate. The State officials had not seen the proposal and based their opinions solely on the information provided by the reporter.

Press coverage was minimal and lacked urgency. Besides the article in question only two other articles were published, three months apart. Those two articles did no

---

* The very sparse record submitted on this appeal does not provide a time frame for these efforts. Thus we are forced to assume by the tense of the questions propounded at the examinations before trial, that the public relations program began at the time the instant action was instituted.

more than announce that a proposal was being developed. There could be no ramifications for the public except the filing of a formal application for licensure. Thus we agree with the reporter's observations that the proposal was only potentially controversial.

The matter never ripened into a controversy because two weeks after its first article, the *Star* published another which informed the community that the proposal had little chance of approval, thereby disarming any projected opposition and discouraging the plaintiff from continuing efforts.

In order to achieve a finding of limited issue public figure the defendants have tried to avoid the effects of the lack of a dispute by emphasizing the public relations efforts of the plaintiff. They urge that the plaintiff be designated a public figure solely because of his own efforts. We do not believe it is necessary to decide whether a person can ever be a limited issue public figure in the absence of a controversy because, even assuming an existing dispute, the plaintiff's actions do not warrant a finding of public figure status.

A fairly high level of activity is necessary for public figure status (see *Bruno & Stillman v Globe Newspaper Co.*, 633 F2d 583; *Yiamouyiannis v Consumers Union of U.S.*, 619 F2d 932, cert den 449 US 839). Here the plaintiff's actions do not meet the standard. During the period of media attention he allowed himself to be interviewed but did not initiate contact with the press; the plaintiff spoke to one group of 12 to 15 people at the request of a neighbor who was one of its members; he gave a copy of his proposal to the only identified opponent of the plan.

We recognize that a plaintiff, having been involuntarily drawn into the limelight, can then choose to engage the public's attention in an effort to successfully influence the outcome of a dispute (see *Bruno & Stillman v Globe Newspaper Co., supra*). Nevertheless, we cannot apply this principle to the plaintiff's substantial public relations efforts after this litigation had commenced. Such an application would require a finding of a continuing controversy and the record in this case does not permit this determination. Here, the feasibility of plaintiff's proposal was not news-

worthy even at the time he tried to influence public opinion. Thus, at best, his actions are relevant to damages only.

Accordingly, it is clear that the plaintiff remains a private figure involved in a matter of public concern. Therefore, the applicable burden cast upon the plaintiff is to demonstrate gross irresponsibility on the part of the publisher by a preponderance of the evidence *(Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, *supra)*. The plaintiff has failed to carry his burden.

One significant illustration is found in the comments concerning past projects of the plaintiff about which the plaintiff has accused the publisher of printing "half-truths": "Listing projects on which he said INTACT has worked Fairley [plaintiff] stated INTACT is responsible for contributing program designs to Harlem Prep, Upward Bound at Fordham University and the Black Studies Curriculum for Manhattanville College. However, upon further investigation all three of these institutions say they have never heard of Charles Fairley or his organization. The directors of the individual projects say they designed the programs at Harlem Prep and Fordham University. In addition, Mary Kelly at Manhattanville College stated that there is no formal black studies curriculum."

The plaintiff has admitted that, without any reservations, he told the reporter that he had submitted program designs to the foregoing institutions. However, during his examination before trial, he conceded that these program designs were submitted as early as seven years prior to the *Star* article and that the designs were submitted informally to high officials of the institutions, but not officials with direct responsibility for the programs. Sometimes the proposals were submitted without acknowledgement of his role as designer. Thus, when the reporter checked his story with responsible officials at these institutions, verification was not forthcoming. Two of those officials who had been asked to verify the plaintiff's contributions submitted affidavits confirming their statements to the reporter.

Given the lack of qualification in the plaintiff's original statements, it is clear that the newspaper was not grossly irresponsible in failing to discover a means to substantiate

the plaintiff's statements and in concluding, after its investigation, that the plaintiff had not contributed program designs to these institutions. On these facts, not even negligence can be found. Our determination is not premised on a theory of estoppel or contributory negligence. A private individual is under no legal duty to tell the truth in dealing with the media. We simply hold that in cases where the plaintiff's statements misdirect the publisher's efforts at substantiation because significant facts have not been related to the reporter, no breach of the constitutionally mandated standard of care can be found.

Accordingly, we hold that there are no issues of fact which would warrant a trial of this action, and we grant summary judgment in favor of the defendants dismissing the complaint.

HOPKINS, J. P., MANGANO and MARGETT, JJ., concur.

Order of the Supreme Court, Westchester County, dated May 6, 1980, reversed, on the law, with $50 costs and disbursements, defendants' motion for summary judgment granted and complaint dismissed.