Henry WYNBERG, Plaintiff,

v.

NATIONAL ENQUIRER, INC., et al., Defendants.

No. CV 76–2110–ALS.

United States District Court,
C.D. California.

Aug. 6, 1982.

Andrew O. Feringa, Downey, Cal., for plaintiff.

John G. Kester, Gerson A. Zweifach, Washington, D.C., Paul P. Selvin, Los Angeles, Cal., for defendants.

## ORDER GRANTING SUMMARY JUDGMENT

STEPHENS, Senior District Judge.

Defendants, National Enquirer, Inc., et al., have moved for Summary Judgment in this action under Rule 56(b), FRCP.

## STATEMENT OF UNDISPUTED FACTS

In 1975, Plaintiff, Henry Wynberg, had a brief but celebrated "close personal relationship," as Plaintiff characterizes it, with Elizabeth Taylor.[1] Although the relationship lasted for only 14 months, it generated at least 86 news articles.[2] The Defendants, National Enquirer, Inc., et al., published a story on March 2, 1976, reporting certain sentiments and opinions concerning the relationship. Mr. Johann Sebastian Bach was Elizabeth Taylor's business manager. While the article included Mr. Bach's statements and opinions covering a variety of incidents relating to the relationship in question, the gist of the article and the basis for Plaintiff's cause of action is that Plaintiff used this relationship for his financial gain.[3] Four months later, Plaintiff commenced this defamation suit against the National Enquirer, Inc., and 10 individuals including the article's author, editors, owners, officers, and shareholders for alleged damage to his reputation.[4] Defendants initially moved to dismiss on the grounds that the article's language was not defamatory; the Court denied the motion on September 20, 1976, on the grounds that the complaint alleged an action for defamation. On January 21, 1982, after substantial discovery had been undertaken, Defendants moved this Court for Summary Judgment pursuant to Rule 56, FRCP.

1. Despite her several marriages, Elizabeth Taylor will be referred to by her screen name throughout this Order.

2. Defendants' Motion for Summary Judgment: Exhibits No. 3 through No. 88.

Since there are no disputed facts, there remain only the following questions of law to be determined by this Court:

A. Whether the allegedly defamatory statements and opinions expressed in the article are non-actionable because they are substantially true?

B. Whether Plaintiff's reputation as reflected by his behavior and criminal convictions render him "libel proof" as a matter of law?

C. Whether Plaintiff has shown facts which constitute evidence that Defendants acted with actual malice towards him in writing and publishing this article?

The motion for Summary Judgment is voluminous. Substantially all of this material is germane to the motion in that each part contributes to an understanding of the circumstances which led to the publication of numerous articles and books about the Plaintiff, and also to the specific article which Plaintiff finds objectionable. The Court has attempted in this Order to make only limited references to the record but not with the intent of rejecting the rest as immaterial.

■■■ A. The allegedly defamatory statements published in the National Enquirer's article are non-actionable because they were sentiments and opinions or substantially true statements of fact. California law defines libel as a false and unprivileged publication, in this case by writing, which exposes a person to contempt, ridicule, or obloquy, and which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation, Cal.Civ. Code § 45 (West, 1954); *Good Government Group of Seal Beach, Inc. v. Superior Court,* 22 Cal.3d 672, 586 P.2d 572, 150 Cal.Rptr. 258 (1978), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Accord: Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Further, if the allegedly defamatory statements are di-

3. Defendants' Exhibit No. 1.

4. Complaint: ¶¶ V, VII, and X.

rected at a "public figure," actual malice must be proved by clear and convincing evidence *New York Times v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Under the First Amendment, the rule is well established that the expression of an opinion does not constitute an actionable cause of action for defamation *Information Control v. Genesis One Computer Corp.,* 611 F.2d 781, 783 (9th Cir.1980); *Gregory v. McDonnell Douglas Corp.,* 17 Cal.3d 596, 600, 552 P.2d 425, 427, 131 Cal.Rptr. 641, 643 (1976). The United States Supreme Court has ruled that "the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth" *Linn v. Plant Guard Workers,* 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1965); *Letter Carriers v. Austin,* 418 U.S. 264, 283–284, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1973). Furthermore, the determination of whether an allegedly defamatory statement is a statement of fact or opinion is a question of law *Gregory,* 17 Cal.3d at 601, 552 P.2d 425, 131 Cal.Rptr. 641; *Accord: Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 13–15, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970).

■ The specific statements attributed to Mr. Bach in the Enquirer article were either expressions of sentiment and opinion or statements of fact, and this is not disputed by Plaintiff. The article quoted Mr. Bach as follows:

"I still cannot understand how such an intelligent woman allowed herself to be fooled by a man like that Wynberg . . ."

The only material portion of this statement are the words: ". . . a man like that Wynberg," which while they characterize Plaintiff as a man who benefitted financially from his relationship with Miss Taylor and who was disliked by her employees, including Mr. Bach, the words do not imply that Wynberg was being accused of having committed a crime which might be an actionable defamation. In the context of this arti-

cle, these words express only Mr. Bach's personal distaste or opinion which is not actionable.

"The total for the 14 months Wynberg lived with Madam was more than two million Swiss francs—which worked out to around $770,000. And I suspect the real total was even more."

The first sentence is a substantially true statement of fact; the second sentence, speaking of what Mr. Bach "suspect(s)," is an expression of Bach's feeling which is not defamatory.

"I discovered one day that Madam had even opened a bank account for Wynberg here in Switzerland. He was always asking Madam for money."

Each of these statements is a substantially true statement of fact which is non-actionable under the laws of libel.

"He entertained hundreds of people to make an impression. I used to see him. It made me feel sick. Especially when I knew that without Madam, his pockets would be empty."

That Mr. Wynberg entertained many people is a non-actionable statement of opinion by Mr. Bach. On the other hand, that Bach saw Wynberg entertain these people, and that such an experience made Bach "sick," are non-actionable statements of fact. Finally, whether or not Wynberg's pockets would have been empty for purposes of financing such extensive entertaining is a substantially true statement of fact as Plaintiff's income tax returns for the years in question indicate.[5]

(Regarding the debts of more than 250,000 francs, or the nearly $100,000 Wynberg left behind when the relationship ended, Bach added) "It was the only thing I was happy about. Madam flatly refused to pay these debts." (Defendants' Motion for Summary Judgment: Exhibit No. 1).

The statement that Mr. Bach was "happy" about Miss Taylor refusing to pay these debts is, of course, an expression of his

---

**5.** Examination of Wynberg's federal income tax returns covering the years immediately preceding, during, and following Plaintiff's relation-

ship with Elizabeth Taylor indicate that he had no net income during the period in question.

personal sentiment about himself, and not about Plaintiff. Miss Taylor's refusal to pay these debts is also an undisputed statement of fact.

■ Under the controlling laws of defamation, even opinions which criticize the character, habits, motives, and morals of an individual—without more—are non-actionable *Gregory,* 17 Cal.3d 596, 552 P.2d 425, 131 Cal.Rptr. 641 (Plaintiffs were characterized as exploiters of their union positions for personal gain); *Raymer v. Doubleday & Co.,* 615 F.2d 241, 243–244 (5th Cir.), *cert. denied,* 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980) (Plaintiff was described as resembling a "hard-boiled egg," as one who "had made but slight scratches on the face of the earth," and as relentlessly small-town in fashion and horizon"); *Hotchner v. Castillo-Puche,* 551 F.2d 910, 914 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977) (Defendant recounted Ernest Hemingway's characterization of Plaintiff as a "dirty and a terrible ass-licker ... [with] something phony about him"). Such expressions of opinion, varying in degrees of accuracy and unkindness, were non-actionable because they were likely to be understood by the audience as part of the rhetorical exchange expected in social disputes, rather than as representations of fact *Letter Carriers v. Austin,* 418 U.S. at 284, 94 S.Ct. at 2781.

■ Other than the statements of personal sentiment or opinion attributed to Bach, the article is composed of factual statements to which substantial truth is an absolute defense. Under California law, Defendant can defeat a libel action by proving that the allegedly libelous publication, although not literally true in every detail, is substantially true in its implication, that the gist of the article, when read as a whole, is true *Alioto v. Cowles Communications, Inc.,* 623 F.2d 616, 619 (9th Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981); *Emde v. San Joaquin County Central Harbor Council,* 23 Cal.2d 146, 160, 143 P.2d 20, 28 (1943); *Kurata v. Los Angeles News Publishing Co.,* 4 Cal. App.2d 224, 227–228, 40 P.2d 520, 522 (1935). *See also: Restatement (Second) Of Torts,* § 581A, Comment f at 236–237 (1977).

Plaintiff brought this action because he believed that the article mischaracterized him as a person who financially exploited his relationship with Elizabeth Taylor, but the record supports this characterization. Each of the allegedly defamatory statements is substantially true. For example: The article states that Wynberg borrowed money from Miss Taylor; Mr. Nat Rubin, Miss Taylor's accountant, stated that Miss Taylor advanced Wynberg over $96,034.77 during the period of their relationship (Rubin Aff. ¶¶ 4, 6). The article next states that Plaintiff left the relationship with outstanding debts owing to Miss Taylor; Mr. Rubin's affidavit shows that Plaintiff received from Miss Taylor approximately $65,734.77 in personal loans (Rubin Aff. ¶ 4) which he never repaid. The article also states that Wynberg purchased items for his personal use with Miss Taylor's money; Mr. Rubin so testified (Rubin Aff. ¶ 4). Next, the article states that Wynberg received a cash settlement from Miss Taylor when the relationship ended; Mr. Rubin's affidavit shows that a joint bank account was established in Switzerland into which Miss Taylor contributed $56,298, whereas Plaintiff contributed only $10,000 (Rubin Aff. ¶ 4); and, Wynberg admitted he spent a portion of this money exclusively upon himself after the relationship formally ended (Wynberg Deposition: 171–172). Finally, the article states that Miss Taylor "shelled out more than $770,000 on their [Miss Taylor's and Mr. Wynberg's] living expenses and on gifts for him" (Defendants' Exhibit No. 1); Mr. Rubin states under oath that the total expenditures of Miss Taylor and Mr. Wynberg for their 14 months, excluding food, exceeded $770,000 (Rubin Aff. ¶¶ 4–9). Plaintiff has filed no affidavits to show that these asserted facts are subject to factual dispute.

■ B. Wynberg's past conduct and criminal convictions establish a bad reputation which, for purposes of this case, render him "libel proof" as a matter of law. Determining the appropriate accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment is never easy nor

finished. Consequently, defamation cases have continually arisen. But past federal and state decisions have given trial courts several flexible rules as an aid in resolving these disputes. When, for example, an individual engages in conspicuously anti-social or even criminal behavior, which is widely reported to the public, his reputation diminishes proportionately. Depending upon the nature of the conduct, the number of offenses, and the degree and range of publicity received, there comes a time when the individual's reputation for specific conduct, or his general reputation for honesty and fair dealing is sufficiently low in the public's estimation that he can recover only nominal damages for subsequent defamatory statements.

First Amendment considerations of free press and speech, promoting society's interest in uninhibited, robust, and wide-open discussion, must prevail over an individual's interest in his reputation in such cases. An individual who engages in certain anti-social or criminal behavior and suffers a diminished reputation may be "libel proof" as a matter of law, as it relates to that specific behavior *Cardillo v. Doubleday & Co.*, 518 F.2d 638, 639 (2d Cir.1975); *Logan v. District of Columbia*, 447 F.Supp. 1328 (D.D.C. 1978); *Ray v. Time, Inc.*, 452 F.Supp. 618, 622 (W.D.Tenn.1976), *aff'd.*, 582 F.2d 1280 (6th Cir.1977); *Urbano v. Sondern*, 41 F.R.D. 355 (D.Conn.), *aff'd.*, 370 F.2d 13 (2nd Cir.1966), *cert. denied*, 386 U.S. 1034, 87 S.Ct. 1485, 18 L.Ed.2d 596 (1967); *Simmons Ford, Inc. v. Consumers Union of the United States*, 516 F.Supp. 742, 750–751 (S.D.N.Y.1981). By extension, if an individual's general reputation is bad, he is libel proof on all matters *Ray v. Time, Inc.*, 452 F.Supp. at 622. Criminal convictions with attendant publicity may make an individual libel proof *Ray v. Time, Inc.*, 452 F.Supp. 608; *Cardillo v. Doubleday & Co.*, 518 F.2d 638; *Logan v. District of Columbia*, 447 F.Supp. 1328.

Plaintiff's reputation for taking advantage of women generally, and of Miss Taylor specifically, is undisputed. With respect to the former, Wynberg does not contest that he has been convicted for criminal conduct on five separate occasions. On February 2, 1962, he was convicted of contributing to the delinquency of minors involving sex and drugs (Defendants' Exhibit No. 91); on December 15, 1964, he was convicted of bribery. To secure police protection for a prostitute, he offered money and the women's sexual services to the police (Defendants' Exhibit No. 93); on July 25, 1977, Wynberg was again convicted of contributing to the delinquency of minors involving sex and drugs (Defendants' Exhibit No. 92). In addition to these morals convictions for sex and drug experiences with women, on December 6, 1974, Plaintiff was convicted of grand theft in turning back odometers on cars which he subsequently sold at a "low mileage" premium (Defendants' Exhibit No. 94). Furthermore, Plaintiff admits to having suffered several default judgments and garnishments against him involving, for example, failure to pay child support, breach of contract, conversion, and fraud. Plaintiff has also admitted that his acquaintances knew about these convictions (Admissions: No. 59–63), and it is undisputed that at least 17 news articles reported Plaintiff's assorted criminal convictions, newspapers covering local, national, and international news fronts (Defendants' Exhibits No. 3–17). Given the nature of Plaintiff's conduct in these incidents, the variety and number of serious offenses which include bribery, prostitution, grand theft, and fraud, and the degree of publicity they received, it is beyond dispute that Plaintiff's reputation for his treatment of women and his general reputation for integrity, truth, honesty, and fair dealing in personal and business matters is bad. Due to the attendant broad publicity which accompanied public discussion of these events in the press and popular magazines, it is widespread, general in the true sense.

Wynberg has established a specific reputation for taking financial advantage of Elizabeth Taylor. Even before the Enquirer's article appeared in March, 1976, numerous articles appeared both in Los Angeles, in the United States, and in Europe, indicating that Wynberg had borrowed money to romance Elizabeth Taylor (Defendants' Exhibit No. 18–19). One article reported a

Wynberg benefactor as saying that the loan was to be considered an "investment" (Defendants' Exhibit No. 20). The *London Mirror News* confirmed the benefactor's statement, reporting that Wynberg had constructed a "return on investment" ratio for his investors (Defendants' Exhibit No. 21). Additional stories appeared stating that Wynberg was hoping to live off trust funds established by Richard Burton for Miss Taylor (Defendants' Exhibit No. 22); that "Liz is preparing to pay off $85,000 in debts owed by the former used-car salesman so he can [avoid jail] on a grand felony charge . . ." (Defendants' Exhibit No. 89); that Wynberg had been made official photographer to Miss Taylor in order to earn spending money. The article in the *National Star* stated:

> "Liz Taylor has come up with a way for her friend, Henry Wynberg, to earn his pocket money. Liz has made Henry her 'official' photographer. Henry is asking about $2,000 per snapshot. He wants even more if they turn out." (Defendants' Exhibit No. 23)

Such articles occurred for three years prior to the Enquirer's publication without objection by Wynberg. These articles state what the Enquirer's article implied: that Wynberg had an established reputation for taking advantage of his personal relationship with Elizabeth Taylor for his financial gain.

   C. Plaintiff has not filed any affidavits showing that Defendant acted with actual malice in writing and publishing the allegedly defamatory article. Owing to his "close personal relationship" with Elizabeth Taylor for over 14 months, and the substantial publicity they received, Wynberg, under controlling case law, is a "public figure" relative to the issue of their relationship *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1973); *Curtis Publishing v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion). *Cf. Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). (In this case, petitioner was dragged unwillingly into a public controversy; Wynberg, on the other hand, actively solicited publicity.) Plaintiff conceded, for example, that he and

Miss Taylor developed a "close personal relationship," which "because of Miss Taylor's well-deserved reputation as one of the world's most accomplished actresses, Plaintiff's close relationship with her was widely reported in newspapers of general circulation" (Plaintiff's Opposition to Motion to Dismiss: August 19, 1976, Appendix: 2). Plaintiff's relationship with Miss Taylor was covered in at least 72 newspapers prior to the Enquirer's story (Defendants' Exhibits: No. 118–134; 41–80). Furthermore, at least 23 additional newspaper stories were published within two years after the relationship formally ended. Three books were also written covering their relationship (Defendants' Exhibits: No. 37–39). As a consequence of the prominence Plaintiff gained from this relationship, numerous newspaper stories were written covering other more general aspects of his life as well (Defendants' Exhibits: No. 90, 40–41, 18–22, 52, 27, 95–105).

Consequently, even if Wynberg's general reputation in business matters and his specific reputation with Miss Taylor had been good, and even if substantially false statements of fact had been made in this article, in order to prevail in this defamation action, the law would require "clear and convincing" proof that the National Enquirer had acted with "actual malice—that is, with knowledge that [the article] was false or with reckless disregard of whether it was false or not" *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334, 94 S.Ct. 2997, 3004, 41 L.Ed.2d 789 (1973); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Merely establishing negligence on behalf of defendant is not sufficient *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Alioto v. Cowles Communications, Inc.,* 519 F.2d 777, 779–780 (9th Cir.1975), cert. denied 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981).

The Record is totally lacking in a showing that competent evidence exists indicating that the article was written and published as true either when Defendants knew it was false, or when Defendants knew that

they did not know whether the article's statements were true or false. The article's author, for example, Mr. David Burk, is an esteemed journalist on the national and international news fronts; he testified under oath by deposition that he sought and secured information and confirmations from more sources on this story than on any other publication on which he worked for the Enquirer (Burk Deposition: 107). Burk consulted with Mr. Bach, his primary source for this story, after Mr. Bach had earlier been established as reasonably reliable on at least three separate occasions (Defendants' Exhibits: No. 113–114). Burk also secured confirmation on the substance of this story from eight independent sources (Defendants' Exhibits: No. 116, 122). He confirmed with Miss Taylor's former Swiss attorney that Wynberg had outstanding debts and that Plaintiff and Miss Taylor had reached a financial settlement prior to the end of their relationship (Defendants' Exhibit: No. 119). Furthermore, Plaintiff has conceded "It is possible that outlandish allegations attributed to Mr. Bach [in the article] were actually made by him" (Plaintiff's Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment: 27). Based upon these facts, which are uncontradicted in any manner acceptable to Rule 56, FRCP, Mr. Burk and his editors were reasonable in relying upon Mr. Burk's sources, and in writing and publishing the story as they did.

During oral argument on this motion, Plaintiff contended that responses by Mr. Bach, Mr. Fah, and Miss Donizetti collected in Letters Rogatory transmitted from Saanen, Switzerland, disputed Burk's reported version of the facts, thus creating a disputed issue of material fact as to actual malice. After examining these proposed responses, the Court has concluded that if they were offered at a trial, they would not be admissible and they are not competent evidence for purposes of this motion. This is so because the Court's Order was not executed according to its terms. Specifically, the witnesses were not sworn, no cross-examination was permitted, and no verbatim transcript was made (Hanly Aff.: ¶4). Without the opportunity for cross-examina-

tion, Courts in the United States often deny admission of responses to Letters Rogatory because of the opportunity for evasive answers or self-serving exculpatory statements by witnesses *Oscar Gruss & Son v. Lumberman's Mutual Casualty Co.,* 41 F.R.D. 279, 282 (S.D.N.Y.1966). In the Court's view, the recorded responses do not show that evidence exists and is available for production at a trial which will constitute a triable issue of fact on the issue of malice. Furthermore, the responses in the return of the Letters Rogatory do not conflict with the statements in the article which are attributed to Mr. Bach.

In light of the undisputed facts in this case and the preceding analysis, Defendants' motion for Summary Judgment is granted on each of these alternative and independent grounds. Counsel for Defendants will submit an appropriate order in favor of Defendants.