Robert C. GUCCIONE,
Plaintiff-Appellee,

v.

HUSTLER MAGAZINE, INC. and Flynt
Distributing Company, Inc.,
Defendants-Appellants.

No. 1478, Docket 86–7277.

United States Court of Appeals,
Second Circuit.

Argued June 26, 1986.

Decided Aug. 29, 1986.

Alan L. Isaacman, Beverly Hills, Cal. (David O. Carson, Cooper Epstein & Hurewitz, Beverly Hills, Cal., Anderson Russell Kill & Olick, New York City, on the brief), for defendant-appellant Hustler Magazine, Inc.

John H. Gross, New York City (Ann V. Kramer, Anderson Russell Kill & Olick, New York City, on the brief), for defendant-appellant Flynt Distributing Co., Inc.

Norman Roy Grutman, New York City (Jeffrey H. Daichman, Thomas V. Marino, Grutman Miller Greenspoon & Hendler, New York City, on the brief), for plaintiff-appellee.

Before NEWMAN, CARDAMONE and PIERCE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Publishers of pornography are, not surprisingly, often criticized and scorned and, on occasion, may even be libeled. This libel action brought by Robert Guccione, the publisher of *Penthouse* magazine, is noteworthy because the alleged libel was authored not by a righteous crusader against smut but by Larry Flynt, the publisher of *Hustler* magazine. An article printed in *Hustler* in 1983 stated that Guccione "is married and also has a live-in girlfriend, Kathy Keeton." In what the District Court for the Southern District of New York (Robert J. Sweet, Judge) characterized as a "grudge match," Guccione sued for libel. The undisputed facts disclosed at the trial revealed that Guccione had been notoriously living with Miss Keeton while still married to Muriel Guccione for thirteen of the seventeen years prior to the article's publication, though he and Mrs. Guccione were divorced four years before the article appeared. Guccione emerged from the fray with a judgment in his favor of $1 in nominal damages and $1.6 million in punitive damages.

We must be careful in cases such as this not to accord either the pornographer plaintiff or the pornographer defendant less protection than would be accorded libel litigants who publish more traditional works of literature or journalism. Bearing that point firmly in mind, we conclude, for reasons that follow, that Guccione's claim fails as a matter of law, both because the statement at issue was substantially true and because Guccione was "libel-proof" with respect to an accusation of adultery. We therefore reverse.

Background

In the "Bits & Pieces" section of its November 1983 issue, *Hustler* printed a half-page article by Flynt that commented on Guccione's practice of being photographed, fully clothed, with naked *Penthouse* models. The article, entitled "What a Ham!" and labeled "Editorial Opinion," was accompanied by a photo from the September 1983 issue of *Penthouse*, depicting a clothed Guccione with his arm around an unclothed model sitting on his knee. The article included the following sentence: "Considering he is married and also has a live-in girlfriend, Kathy Keeton ... we wonder if he would let either of them pose nude with a man" (elipsis in original). Guccione contends primarily that the quoted language falsely accuses him of committing adultery in 1983, when the article appeared. He also suggests that it falsely implies that he was then living with his wife and girlfriend simultaneously. It is undisputed that Robert and Muriel Guccione married in 1956, separated in 1964, and divorced in 1979; Guccione has not remarried. It is also undisputed that Guccione has cohabited with Kathy Keeton since 1966.

Guccione, who is a public figure, sued Hustler Magazine, Inc. ("HMI") and Flynt Distributing Company, Inc. ("FDC"), alleging defamation, invasion of privacy, and copyright infringement.[1] The privacy and copyright claims were dismissed and are not pursued on appeal. The defendants unsuccessfully sought summary judgment, alleging the absence of actual malice and the substantial truth of the publication.

At a boisterous trial that gave new meaning to the term "adversary proceeding," Guccione contended that the article was libelous per se because adultery is a crime in New York, N.Y. Penal Law § 255.17 (McKinney 1980), and that he was entitled to nominal damages even if he had not demonstrated injury to reputation. He further claimed that the defendants printed the libel with actual malice, that is, knowl-

---

**1.** Larry Flynt, the publisher of *Hustler,* was named in the complaint but was dismissed be-fore trial for lack of personal jurisdiction in New York.

edge of its falsity or reckless disregard for whether it was true or not. In support of this claim, Guccione presented evidence that he had testified about his 1979 divorce at the televised Ohio trial of a previous libel suit against HMI, that Flynt attended much of the trial, and that in connection with that trial Muriel Guccione discussed the divorce during the course of a deposition attended by HMI's attorneys. Guccione also elicited testimony that Flynt and his business associates are self-professed "Guccione watchers" with excessive interest in the details of the *Penthouse* publisher's private life. Finally, Guccione offered excerpts from other issues of *Hustler* to show that Flynt bore ill will toward Guccione. Guccione sought compensatory and punitive damages and, at the damages phase of the trial, offered into evidence the entire November 1983 issue of *Hustler.*

Throughout both the liability and damages phases of the bifurcated trial, Guccione's attorney, Norman Roy Grutman, whose melodramatic appeals to jurors' passions and prejudices have previously been criticized by this Court, *see Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 141 (2d Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985), demonstrated the inadequacy of our prior cautions. Grutman described Flynt as "the Son of Sam among publishers," a "Philistine Goliath," and "Quasimodo"; he called Flynt's and *Hustler's* attacks on Guccione "torture" and "death by a thousand cuts"; he said those connected with the alleged libel were trying "to poke Mr. Guccione in the eye with a sharp stick, just as they have been doing for 10 years." At the close of his summation in the damages phase of trial, Grutman urged the jurors, "[i]n the name of the Almighty," to award Guccione large sums in compensatory and punitive damages.

The defense case was presented with equal vigor, though with less flamboyance. In addition to maintaining throughout that Guccione's adultery for thirteen years— from 1966, when he began living with Kathy Keeton, until he was divorced in 1979— made the printed statement substantially true, HMI and FDC argued that the alleged libel was published without actual malice and that in any event Guccione could not recover because his reputation had not been damaged. To support the latter argument, the defendants elicited from Guccione testimony that he suffered no mental anguish since his parents, children, social friends, and business associates knew he had been living with Kathy Keeton while still married. In addition, the defendants introduced into evidence numerous issues of *Penthouse* and excerpts from other magazines published by Guccione containing articles describing or advocating extramarital sexual relations. The purpose of this evidence was presumably to demonstrate that Guccione views adultery as acceptable conduct. Indeed, he testified that in his opinion he was not committing adultery from 1966 to 1979 and that he sees no social stigma attached to adultery.

The defendants also attempted to show that Guccione's reputation for matters relating to his marriage and adultery is so bad that he is "libel-proof" with respect to the *Hustler* article. The defendants attempted to offer as evidence, in addition to the articles and excerpts mentioned above, several articles from major publications in which the fact of Guccione's marriage and his contemporaneous relationship with Kathy Keeton are described. The District Court refused to allow into evidence articles probative of Guccione's reputation prior to 1978 during either the liability or the damages phase of the trial.[2]

2. The excluded articles were also relevant to the appellants' defense of lack of actual malice, since Flynt and other *Hustler* personnel claimed to have had no specific source for the allegation of adultery but to have read in various magazines that Guccione was living with Keeton while still married. Grutman repeatedly emphasized to the jury appellants' failure to sub-

stantiate their story with specific magazine articles, leaving the jury to assume that no such articles existed, when in fact he knew that the articles had been excluded by the District Court. Admission of the articles would not likely have changed the jury's ruling on actual malice, however, since the evidence suggesting that appellants knew of Guccione's divorce prior to pub-

At the end of the trial's liability phase, the jury concluded that the statement "Considering he is married and also has a live-in girlfriend, Kathy Keeton" constituted libel per se as defined by the District Court, was false, and was published and distributed with actual malice. At the damages phase, the jury found HMI and FDC liable to Guccione for one dollar nominal damages for injury to reputation, the minimum allowed by the Court, but gave no award for mental or emotional distress. In addition, the jury awarded Guccione punitive damages of $900,000 from HMI and $700,000 from FDC. The defendants then moved for judgment notwithstanding the verdict and for a new trial. The District Court denied these motions, 632 F.Supp. 313 (S.D.N.Y.1986), and this appeal followed.

## Discussion

On appeal, HMI and FDC raise a host of issues. They argue that the District Court misdefined libel per se and improperly allowed the jury to return a finding of liability without any proof of injury to reputation, that the published statement was substantially true as a matter of law and that the District Court's instruction erroneously eliminated the substantial truth defense, that Guccione is libel-proof as regards an accusation of adultery, that the record contains insufficient evidence to support the jury's finding of actual malice, that the punitive damages are excessive, that punitive damages in libel cases involving public figure plaintiffs and media defendants are unconstitutional, that the jury verdicts on liability and damages were based on prejudicial evidence that should have been excluded by the District Court, and that misconduct by Grutman warrants a new trial. We consider only the substantial truth and libel-proof issues and conclude that on each ground summary judgment in HMI's and FDC's favor was required.[3]

lishing the alleged libel—testimony regarding the Ohio libel trial—related to appellants' knowledge as of 1981, whereas the excluded articles were published between 1972 and 1974.

■ Under New York law, which applies to this diversity suit, it is "fundamental that truth is an absolute, unqualified defense to a civil defamation action," *Commonwealth Motor Parts Ltd. v. Bank of Nova Scotia*, 44 A.D.2d 375, 378, 355 N.Y. S.2d 138, 141 (1st Dep't 1974) (citation omitted), *aff'd*, 37 N.Y.2d 824, 377 N.Y.S.2d 482, 339 N.E.2d 888 (1975), and "substantial truth" suffices to defeat a charge of libel, *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 297, 445 N.Y.S.2d 156, 159 (2d Dep't 1981). If the statement at issue in this case was substantially true, the claim of libel was legally insufficient and the complaint should have been dismissed, regardless of any impact the statement might have had on Guccione's reputation.

The burden of proving the falsity of the alleged libel rested with Guccione. *See Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943, 950, 366 N.E.2d 1299, 1306, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). He maintains that because the statement was phrased in the present tense it accused him of committing adultery at the very time the statement was printed, that is, in late 1983, and that the fact of his 1979 divorce rendered the statement false. Guccione concedes that the substantial truth defense permits a certain amount of leeway as to accuracy. He argues, however, that whether the statement at issue was substantially true was a jury question resolved in his favor by a properly instructed jury. We disagree.

The District Court gave the following jury instruction on substantial truth:

Guccione must ... establish that the statement was false. If the statement is true or substantially true, it cannot be libelous. It's not necessary of course that a statement be literally true. The test is whether the statement, as it was published, had a different effect on the

3. The Supreme Court has recently demonstrated its willingness to dispose of libel claims brought by public figure plaintiffs on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

mind of the reader than the actual literal truth. The facts which are offered to support a claim of substantial truth must be as broad as the alleged libel. Therefore, you have to determine the scope of the alleged libel before you can determine whether or not the statement was substantially true.

632 F.Supp. at 322. To this point, the charge was unexceptional. Unfortunately, however, the next paragraph improperly permitted the jury to disregard the substantial truth defense. The trial judge continued:

Put another way, if you determine that the libel in question should be read as accusing Guccione of committing adultery only in 1983, the fact that Guccione might have committed adultery at another time is not going to make the statement substantially true. However, if you determine that the libel should only be read as accusing Guccione more generally of being an adulterer, you can then consider the evidence of Guccione's prior actions in relation to this issue of substantial truth.

*Id.* at 623.

This portion of the instruction permitted the jury to read the alleged libel as accusing Guccione of committing adultery "only" in 1983, in which event the jury was not to consider whether his past adultery made the statement substantially true. Though such a consequence would follow from such a reading of the statement, that reading is not within the range of reasonable interpretations requiring the jury's resolution. The statement was not an allegation of a specific act, like robbing a bank, that might in some circumstances be fairly interpreted either to mean that the act was committed at a time immediately prior to the publication or to mean that commission occurred at some time considerably earlier. The statement about Guccione alleged ongoing relationships—marriage to his wife and cohabitation with his girlfriend. There is not the slightest indication from the statement, or from any evidence offered that might aid in interpreting the state-

ment, that it may fairly be read to mean that the marriage and the cohabitation existed simultaneously *only* at a moment or brief interval just prior to the article's publication. The statement can be read to mean only that the marriage and the cohabitation existed simultaneously throughout an undefined span of time that included the period immediately prior to publication.

■ On this reading, the undisputed facts establish the defense of substantial truth as a matter of law. New York law recognizes that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation. *See Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934). The published statement read, "Considering he is married and also has a live-in girlfriend, Kathy Keeton … we wonder if he would let either of them pose nude with a man." Substituting the truth for the false statement yields the following: "Considering that from 1966 to 1979 he was married and also had a live-in girlfriend, Kathy Keeton … we wonder if he would let either of them pose nude with a man." The only difference in effect between the two statements worked in Guccione's favor; as printed, the statement merely points out the fact of his adultery, without calling attention to its duration for thirteen of the preceding seventeen years.

This is not to suggest that every person guilty of even a single episode of marital infidelity has no recourse if, years after the fact, he is accused in print of currently committing adultery. However, the undisputed facts of this case—the extremely long duration of Guccione's adulterous conduct, which he made no attempt to conceal from the general public, and the relatively short period of time since his divorce—make it fair to say that calling Guccione an "adulterer" in 1983 was substantially true. Of course, "former long-time adulterer" would have been more precise. But on the facts of this case, to require such a level of accuracy is unreasonable. The article labels Guccione an adulterer. The average

reader would understand that term to include a man who unabashedly committed adultery for thirteen of the last seventeen years and whose adulterous behavior ended only because his wife ultimately divorced him. Where, as here, "the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Cafferty v. Southern Tier Publishing Co.*, 226 N.Y. 87, 93, 123 N.E. 76 (1919).

 The undisputed facts also establish that Guccione's libel complaint fails because Guccione was "libel-proof" with respect to the accusation of adultery printed in the *Hustler* article. We have recognized that a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject. *See Cardillo v. Doubleday & Co., Inc.*, 518 F.2d 638, 639–40 (2d Cir.1975). It has also been recognized that a plaintiff may have had his reputation so badly damaged by true statements in a particular publication that minor false accusations within the same publication cannot result in further meaningful injury. *See Simmons Ford, Inc. v. Consumers Union*, 516 F.Supp. 742 (S.D.N.Y.1981) (Weinfeld, J.). The libel-proof plaintiff doctrine is to be applied with caution, *see Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977), since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements, even if their damages cannot be quantified and they receive only nominal damages. But in those instances where an allegedly libelous statement cannot realistically cause impairment of reputation because the person's reputation is already so low or because the true portions of a statement have such damaging effects, even nominal damages are not to be awarded. Instead, the claim should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be

avoided. *See generally* Note, *The Libel-Proof Plaintiff Doctrine*, 98 Harv.L.Rev. 1909 (1985).

 Guccione argues that the libel-proof plaintiff doctrine may not be applied to him with respect to the subject of adultery because he has not been convicted of the crime of adultery. Though criminal convictions were the principal basis for the low reputation of the libel-proof plaintiff in *Cardillo*, the doctrine is not limited to plaintiffs with criminal records. *See Simmons Ford, Inc. v. Consumers Union, supra.*

In *Wynberg v. National Enquirer, Inc.*, 564 F.Supp. 924, 928–29 (C.D.Cal.1982), the Court recognized that a plaintiff may be rendered libel-proof by evidence apart from criminal convictions. In *Wynberg*, the *National Enquirer* published an article stating that the plaintiff had used his relationship with Elizabeth Taylor for financial gain. In finding Wynberg libel-proof, the District Court first noted the plaintiff's string of convictions for crimes that damaged his reputation for his treatment of women in general. The Court then relied equally, however, on Wynberg's "specific reputation for taking financial advantage of Elizabeth Taylor," citing numerous articles, printed prior to the *National Enquirer* piece, that ascribed to Wynberg a profit motive in his relationship with Taylor. *Id.* No criminal convictions related to Wynberg's dealings with Taylor. The non-criminal evidence was perhaps the more appropriate basis for the determination that Wynberg was libel-proof, since it showed that his reputation was already severely damaged with respect to the precise point of the alleged libel.

 In the present case, the District Court based its ruling that Guccione was not libel-proof on the absence of criminal convictions and the lack of publicity regarding Guccione's adultery. 632 F.Supp. at 323–24. We have rejected the first basis and also conclude that undisputed evidence sufficiently established that Guccione's reputation regarding adultery rendered him

libel-proof on this subject. Guccione testified that from 1966 until 1979 his relatives, friends, and business associates knew that he was living with Keeton while still legally married. He acknowledged that he never hid either his marriage or his relationship with Keeton from anyone. Guccione on several occasions told reporters both that he was separated from his wife and that he was living with Kathy Keeton.

Defendants offered magazine and newspaper articles as evidence of Guccione's poor reputation on the subject of adultery. These articles, which describe both Guccione's marital status and his contemporaneous relationship with Keeton, appeared in widely circulated publications such as *Newsweek*, *New York* magazine, and the *Washington Post*. With one exception, a 1978 article in *Maclean's*, a Canadian magazine, the District Court excluded this evidence, apparently because it viewed the publications, printed in the early– to mid– 1970's, as being too remote in time to be relevant to the state of Guccione's reputation in 1983.

In our view, this evidence, the authenticity of which is undisputed, was improperly excluded. The articles were extremely probative of Guccione's notoriety for adultery during the period when his adultery was most newsworthy—while it was occurring. The articles, in combination with Guccione's testimony, show wide dissemination of the information that Guccione was living with Keeton while still married. The damage to Guccione's reputation occurred a decade before *Hustler* published its November 1983 article and stemmed from truthful reporting of facts freely admitted by Guccione himself. Any subsequent reporting accusing Guccione of adultery prior to his 1979 divorce could not further injure his reputation on the subject.

Nor is it tenable to maintain that Guccione, though libel-proof as to adultery from 1966 to 1979, somehow succeeded in restoring his reputation during the four years prior to the *Hustler* statement. As with the defense of substantial truth, the pertinent circumstances are the long dura-

tion of a widely known adulterous relationship combined with the relatively short period between its end and the article's publication. Moreover, the evidence provided no adequate basis for concluding that those who knew of the adulterous relationship from 1966 to 1979 became aware that the divorce occurred in 1979, thereby ending the adultery. Guccione's reputation for adultery could not have been further damaged by the publication of the alleged libel in 1983.

### Conclusion

Both the substantial truth of the alleged libel and Guccione's libel-proof status as to adultery in 1983 provided independent bases for granting summary judgment to HMI and FDC. The judgment of the District Court is reversed.